case is Florida East Coast East Coast Holdings v. Lexington Insurance Company. Mr. Ellis. May it please the court. Jonathan Ellis on behalf of Florida East Coast Railway Holding Company. When FEC removed some 600 railroad crossing gates as Hurricane Irma bore down on the coast of Florida, it did exactly what the insurers expected it to do. Had Irma's 60-mile-an-hour winds been permitted to strike the aluminum crossing gates, designed to withstand winds of only up to 40 miles an hour, it would have caused widespread property damage for which the insurers would have been responsible and would have threatened human life in the process. When FEC then filed a claim for the costs it incurred in taking those precautionary measures, it should have done again what the insurers expected. After all, FEC had purchased an all-risk policy that covered named windstorms and provided coverage for exactly the sort of precautionary measures that it took. Rather than be grateful that FEC had prevented greater losses though, the insurers then applied an interpretation of the policy and principally the named windstorm exception that effectively removed that precautionary coverage. The district court affirmed that reading, but this court should reject it and reverse. Most fundamentally, the district court erred by imposing the named windstorm deductible based on 5% of FEC's system-wide automatic crossing gating system. The named windstorm deductible applies based on 5% of property values only at locations damaged. And because of my client's responsible efforts to prepare for Hurricane Irma, there were no locations damaged. And so there's no basis to apply any deductible above the minimum 700. I say I agree with you and that the deductible here should be $750,000. Thank you, Your Honor. What evidence do we have? Is this just going to require remand for the district court to figure out exactly what the loss in excess of $750,000 would be? Or could we actually determine that? Because it didn't appear to me that the record was developed enough to where we could actually determine what that amount is. The district court, it seemed to me, was right about it being limited to the 48 hours, right? But in terms of what the actual amount of loss, it does appear to me that it's probably in excess of $750,000. I don't think there's any dispute it's in excess of $750,000. I actually don't think there's, I think there is evidence to establish the amounts of coverage depending on which clauses you apply. So the district court concluded that the preservation of property clauses must apply. And if that's the case, then our expert report, it's at A167-85, establishes those numbers. And I think you've got $2,148,690 for the expenses in removing and installing the gates. And then I think actually the parties agree that the 48-hour period, it would be $1,291,823. Now we, if that's... So it would be $1,291,823 minus $750? So it's $2,148,690 for the removal of the gates, plus $1,291,823 for the business interruption for that 48-hour period, and then there's a $66,000 professional fees. I think that's all there. You could do the math and you could enter judgment. I don't actually take my friends to be disputing the numbers anymore or the evidentiary showing on that basis. All of that with a deduction then of $750,000? Yes, Your Honor. So you're saying you would tally those three figures and then minus $750,000? Yes, Your Honor. And we do actually dispute that we need to rely. We agree that the preservation of property clauses provide at least that much protection. So we've got at least that much protection. Our view is that there are other provisions in the policy that provide  Well, can you just go back to the preservation? Because then there's that second clause that says this extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred. So what do we do with that language? Yeah, so I think what that provision means is that it tells you which of those, if you look at the deductibles, this is at page 5 and 6 of our brief, or A329. You've got the sort of layout of all the various deductibles. You've got a railroad operations deductible, the named windstorm exception, the flood, the earthquake, the fine arts. I read that provision to say if you take action to preserve your property, then when you look to figure out what the deductible is, you apply the one of those that I just told you that would have applied had the property damage actually occurred. So if it was a flood, you apply the flood. If it's an earthquake, you apply the earthquake. If it's a named windstorm, you apply the named windstorm. What it doesn't say is then how to calculate the named windstorm. And none of the other deductibles actually have a calculation like that. They're all set except for the named windstorm. And there, I think, it doesn't speak to that. At least it doesn't have to speak to that. We have a reasonable reading of that policy. And under Florida law, you have to adopt our reasonable reading if it provides us greater coverage. And so I think you say, well, there's an ambiguity, right? Right, right. So are you conceding then this policy is vague? I don't think it's actually ambiguous as to the application of the named windstorm. I think it's fairly clear that that applies. There's two ways the named windstorm deductible can apply. One is that is 5% of the property values at the locations damaged or to the minimum 750. But they would have to be damaged. But there's no damage. There's no locations damage. I don't think that's actually ambiguous at all. And so and then when you go to that deductible, now the preservation clause says, go look at that deductible. Fine. Look at the named windstorm deductible. No locations damaged. So you apply the minimum 750. Let me ask you a pretty basic question just to make sure that I'm understanding the framework, how I'm going to evaluate the deductible issue. Sure. In my hypothetical, let's say we decide that the Section B Protection and Preservation Clause is subject to a $750,000 deductible. But the Section C Clause is subject to the named windstorm deductible. Do we apply the $750,000 deductible to the cost of removing the gate and the named windstorm deductible to the lost time costs? And what I'm trying to get at is can different deductibles be applied to different aspects of the same claim? So I think it's the same. You would apply the deductible that is the highest. And then we decide the claim. Then you're going to go from there, decide which one provides the overall the best, the most coverage for our losses. So you could have different deductibles. Well, there's only one deductible that applies. I think you just need to do the math to figure out which of these is going to lead to the most coverage. I don't want to fight the hypothetical, but I think you get to the same place, though, because the named windstorm deductible as it applies in this case is $750,000 because there are no locations damaged. And so I don't think it actually matters. I think you get to the, you find the named windstorm deductible, you apply the railroad operations deductible. Either way, the deductible for our claim is $750,000. Well, let me pose it a different way. So forget calling it named windstorm. If it's one is, if we think that one of your claims falls under the $750,000 deductible and the other one is the 5% of the value, can we do that? Because there's another provision that says if two or more deductibles provided in this policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable. That's right. So if you think that the preservation element, the Section C preservation clause, would require 5% of the property value, and you conclude, as the district court did, that that's $11 million, I think you just drop that claim. That doesn't provide us any protection. And what the court should do is provide, figure out the sort of policy clauses here that provide us the greatest protection. But again, I really don't think you need to get there because I really think there's no basis to get to an $11 million deductible based on locations damaged when there were no locations damaged. Now, if I could just speak to where we think the right way to do the coverage analysis here, we actually think that there's another way. There are overlapping clauses in this contract, as there often are in insurance policies, that provide greater protection. And we think the court should choose that greater path. We've laid out a number of them. The district court, it seemed to me, was right about all of those. Well, and if that's where you land, I... I notice that that's not where you started your argument this morning either. I think the principal flaw is the name Windstorm Reductible. But I do think we have a good argument. I think a reasonable reading of the expense to reduce loss clause and the business interruption provision, that does provide us coverage for our full claim, the full 5.6. I don't think that reduce can reasonably be read to not speak to reduction to zero. And so I think the expense to reduce loss clause applies. And then I think that for the business interruption, the district court found that there was no direct physical loss. And I think under what Florida law says is that physical loss has to result in a physical alteration. This policy does seem to distinguish, though, between reduction and prevention. So I don't think that's... Like I said, there are overlapping coverages, to be sure. The preservation clauses apply to actual or impending losses. The expense to reduce loss clause just speaks to it in one term with reduce. I think we, again, we have at least a reasonable reading of that. If it's ambiguous, I think you've got to adopt ours and follow that to get the full expenses under the expense to reduce loss and then the business interruption. Anything else you want to tell us, Mr. Ellis, before you go off to bed? Well, I'll save the rest of my time for rebuttal. Okay. All right. We'll give you the benefit of five minutes of rebuttal since you did give up some of it. Your Honor, Paul Fields. I represent Ironshore Specialty Insurance Company. Recognizing where the court is going and your questions, I was going to address the protection and preservation of property and my colleague, Eric Craitchie, was going to address the deductible. Would the court like to reverse that because you seem to have focused in on the deductible, Your Honor? No. What I want you to do is whatever you think is in your client's best interest. Your Honor, then I'm going to ask Mr. Craitchie if you were to address the deductible issue because he's a little ... May it please the court, my name is Eric Craitchie. I'm with the law firm of Mound, Cotton, Wallen, and Greengrass, and I represent the appellees in this case. As Mr. Fields has explained, I will be discussing the application of the 5% named windstorm deductible here. It is undisputed that Hurricane Irma fits the definition, the policy's definition of a named windstorm, so the 5% named windstorm deductible must apply. That percentage named windstorm deductible applies the same way it does in every other policy homeowners ... It's 5% of property values at locations damaged from a named windstorm, right? Correct. There was no damage. Correct, Your Honor, and that's the idea. This is a property insurance policy. Every single coverage requires direct physical loss or damage except for the two protection and preservation of property provisions, and because of that, those two provisions expressly mention how the deductible will apply, and as FEC claims, they talk about the hypothetical scenario of damage occurring, and both the Section B, protection and preservation of property provision, which applies for property damage, and the Section C, protection and preservation of property, which occurs to time out in the business interruption, both have that hypothetical scenario, so under the Section B provision, it states, insured property covered through this clause shall be added to the direct physical loss or damage otherwise recoverable under the policy and subject to the applicable deductible, so the way that works is ... But there wasn't any damage added to it. Of course, Your Honor, and that's because this provision is expressly applied. That provision seems to me to be just inoperative in this situation. Well, Your Honor, they're saying that they've protected the property in anticipation of immediately impending damage, and that's exactly what this provision provides. They get coverage for that. They get coverage for preventative measures subject to a deductible of 750, but now you're reading from language about what do you do in the event that you have direct physical loss or damage and adding to that, but that provision seems to me to be wholly inapplicable when there was no damage. Well, respectfully, Your Honor, I disagree because ... But what are you adding it to? Zero. Well, you're adding it to the column of whatever is going to be paid, so whether it's direct physical loss or damage, that's really ... It's saying that direct physical loss or damage otherwise recoverable, so they're talking about the money that would be paid if there was damage, so you take ... In a situation where you have protective measures and damage, you would have the protective measures goes into the column of what's recoverable, and you look at the column of what was damaged, and that's recoverable. In a situation here ... Then damage happens. Right. In a situation here where there is no damage, you take the protective measures, you put that into the column of what is recoverable, and there is nothing else recoverable because they're not claiming any other property damage. That doesn't take away those other ... The protection expenses from now being moved into the column as if it was damaged, so that's what you do. You take those damages as if they were damaged, and look, the whole purpose here is to apply the deductible as if the damage occurred. That's the whole purpose of both of these provisions. Well, I thought that the purpose of the policy, at least what they were relying on, is when they're successful in preventing damage, but now the damage that didn't happen is still being used against them when it comes to recovering some of their insurance benefits. I know there's not a public policy claim or argument here, but I'm trying to understand how is it that you're encouraged to prevent or reduce damage, but then you're penalized when there's no damage? Respectfully, Your Honor, the reason that happened in this particular claim is the unique nature of Hurricane Irma. Hurricane Irma was projected as a Category 4 storm that was going to run directly north-south through the central of Florida, and what that did, that triggered FEC's requirements to remove every single gate throughout the 351 miles of their stretch from Miami all the way to here in Jacksonville. Because of that, that's what caused such a high deductible value. You had to replace all of those, take the 5% of all those values. In a normal storm that comes up, say, from the southeast that only hits a small corridor, say it's only going to hit Miami, Dade County area, then there's a very small, limited number of gates that would be impacted. The reason why there was no damage here is that it veered off to the west and went parallel to the... So I'm not asking for weather predictions. I'm asking, I'm trying to figure out, why is it that they have to be held accountable for damage that didn't occur? Because the protection and preservation of property provisions, both of them, provide coverage in the absence of damage, which is an exception to every other coverage. So because of that... Subject to deductibles.  Right, of 750, and you've got this 48 hours prior to and after you take the preventative measures, that's a way to limit your liability. But now what you want to do is also benefit from a clause that adds to the damage, when there was no damage, those preventative measures, to increase the deductible. That's the part I don't understand. Well, FEC did a good job of trying to say a heightened deductible, it's a heightened... There is no heightened deductible here. There is no extra deductible. It is a hurricane deductible, and it applies 5% of the values. The minimum is 750. So we take... You have to calculate that deductible some way. You don't just revert to the 750 minimum. It is the hurricane deductible, and the way you do that is two different ways. Under the Section B provision, you take the 5% of what was the property that was protected, and you deem that as if it was damaged, and you take those values. Now, if you look at the Section C provision, and this is something that... Look, if this had been a windstorm that actually caused damage? Correct. And I understand how this would work, right? But that's not what we're talking about. Correct. And the problem here is that if you accept FEC's interpretation, they are adding words to the Section B provision, where it says, if there is direct physical loss or damage, then you can take the insured property covered through this clause and add it to the what is other damage. But that's essentially avoiding the whole nature of this provision that it provides coverage in the absence of damage. So that's why you have to apply this in the absence of damage. Otherwise, you are effectively writing it out. And I just want to take another second to touch something that Judge Branch had mentioned. FEC has acknowledged that the hypothetical scenario of your work as if this direct physical loss or damage occurred, that applies to the entire claim. The deductibles apply per occurrence. And as Judge Branch had mentioned, you must apply... If there's two or more deductibles apply, it applies... The highest deductible applies, and it applies to the entire occurrence, not just to the individual facts of that. So to the extent now that they've agreed that this hypothetical scenario, we act as if the damage actually occurred to those gates, then that would apply to the entire claim. Your Honor, may it please the Court, my name is Paul Fields, and I represent Ironsore Specialty Insurance Company. I do want to follow on to what my colleague, Mr. Creci, has said. And I think it's important if we look at the purpose of the protection and preservation of property extensions is to encourage the insured to come in and take precautions. We know that occurred. But the presumption is that you are essentially performing a hypothetical, what if the actual damage had occurred? If you look in the Section C portion, it says in the very last sentence, this exclusion, the protection and preservation of property, it says the provisions would apply, that would have applied had the physical loss or damage occurred. So we're talking about in the time element section, Section C, you're looking at those things. Similarly, if we look at what happened for all of the gates, the document, there were crossing guards, approximately, I think it's 600 crossing guards, crossing gates that stretch from Miami to Jacksonville. In the record, it's document 28-3, page 9, there's a summary. The value is $219 million. And page 16 through 46 of the record 28-3, there is actually a listing of those various crossing guards. And so at each of these gates, there was, these gates were taken down, displaced, and they are making a claim essentially for each of those gates at each of those crossing guards. So what we essentially have going on is that we are treating each of those gates as if there has been damage. And if you take the way the district court arrived at it and the way we believe is correct, you take the $219 million, apply the 5% named windstorm deductible, because in theory, damage happened at each of those gates that was protected. And that was they took down those arms, they attached them, and then they went back afterwards after the storm had passed. Oh, so you're saying that their conduct constituted damage that would then trigger the 5%? Yes, Your Honor. I would say that's how it has to be treated. Because the only section in this, every section of this policy, because it's a commercial property insurance policy, every section requires physical loss or damage. That's, it's well settled, it's written throughout the entirety of the document. And this court, S.A. Palm, many other cases have, you know, addressed the necessity of physical loss or damage in a property policy. This policy has an express, two express provisions. Protection of preservation of property in Section B and protection, protection of preservation of property in Section C. In both of these instances, it is talking about what is necessary to prevent imminent physical damage. So what, what is, what is recovered there is if you go in and you are protecting imminent physical damage from occurring, then you would treat it as if there was physical damage that had occurred at those locations. So they've simply mitigated damage. They've lessened the damage that would have occurred. They've lessened the damage that would have occurred. They've caused damage. I, I would say,  it is treated under this policy as if they had caused damage. Because, because that's the only way you can treat this, this provision and it says you would add it to other physical loss or damage that would have occurred. It is interesting if you look at the record, um, they,  it, uh, there was actually damage that occurred that they have decided not even to make claims for. To try to avoid the application of the 5% windstorm deductible. That is a bridge that was damaged. That's the record 28.3 page 61 and 28.2 uh, page 241 of 246. So they were trying to shoehorn essentially fit a round peg into a square hole and pretend like there was no damage when some damage actually did occur. But they're trying to say we have no damage only apply the 750 deductible instead of the 5% name windstorm. And there are no other provisions that speak to what happens when you cause the damage? I mean, isn't the whole point to mitigate damage? The whole, the whole point including your own behavior? Well, the whole point is for you to take the necessary protections to protect your property. And, and there was a, and certainly the wind, the wind had it come in and the crossing gates that could have caused significant problems if a 120 mile an hour wind had taken these crossing gates. And what would it have done? It would have caused damage, specific damage to all of these locations. So it would have come in and torn up probably when you see the rail things go down it would torn up the electronics, et cetera, et cetera. They took it down at each of these locations, at 600 of them. Yeah, and if they really, if the windstorm had actually landed in a way that created a lot of damage I can understand why the insurance company gets protection from a, a higher deductible that, that adds the actual property damage to the preventative measures. But where there is no actual property damage which you're relying upon about adding two things together just doesn't seem to be operative at all. Well, Your Honor, with all due respect if we're to and fully recognize in your position but with all due respect if we look at how are we going to calculate where this damage occurred we, we go back and look at each of these locations at, as I mentioned 28-3, excuse me, 28-3 page 9 with a summary. Each of these locations that they went to and that they removed crossing gates and took down and that they're making a claim for each of these locations the value is $219 million. That is what the value is at each of these locations. And if you take 5% of that you come to the number essentially $10 million and some odd thousand dollars. $10 million and several hundred thousand dollars. And that was what was applied because that is the culmination.  you're going to that's the only way you can do it because each of these locations they took action at. It's not like there was a single single location that was worth a small amount of money. They went to all 600 crossing gates and took them down. And your honor I, you know saw Chief Judge Pryor said he I think you understood the position on the protection and preservation of property. Each of the other provisions that were cited just to briefly touch on this where they make the expenses to reduce loss et cetera all of those require direct physical loss or damage for those to apply. I do want to note that there's some ambiguity in what the the appellant is actually claiming. At one point in the trial court they were making reference to extra expense when and that they were claiming under that section when I was reviewing their reply brief it appears that they have dropped the claim for extra expense and substituted in a claim for compensation. But I do want to emphasize for this panel that it is only the preservation and protection of property in Section B and Section C that provides coverage for impending impending damage if actions are not taken. Thank you,  Thank you Mr. Peebles. Mr. Ellis, you've saved five minutes actually Valerie because he gave us two minutes. Thank you, Thank you,  Just a few points. I want to start with the language in the preservation clauses about the right deductible to apply if those are the ones that the court concludes provides coverage here. Section B says that the losses covered under that shall be added to direct physical loss or damage otherwise recoverable and subject to the applicable deductible. Then the Section C preservation clause says if you rely on that provision the extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred. I think both of those do no more than say than point the court to the deductible provision at issue the name windstorm deductible. That name windstorm deductible though has two different ways of being calculated. Either 5% of the property damage at the property values at the locations damaged or subject to a minimum deductible of $750,000. So even if you take those provisions for all they're worth all they do is point you to the name windstorm deductible. They don't tell you how to apply the name windstorm deductible and as Chief Judge Pryor was noting when you get there there are no locations damaged because of our efforts to preserve the property. Your opposing counsel just said you did the damage. They have been saying the opposite the entirety of this case. As he just ended they say we can't rely on the expense to reduce loss or the business interruption provisions because there was no direct physical damage. I don't think they can now say for the purposes of the deductible I'm sorry? You don't think that's right. They have been saying all along there has been no damage and I agree there has been no damage and so when you calculate the name windstorm deductible you apply it to the minimum deductible of 750. I think if you have any doubt about that if you think about how this would work if we had not been successful in avoiding all damage and instead had some damage and then some preservation their reading would say the way you apply the name windstorm deductible is somehow to take 5% of the property values at the locations damaged where there was actual damage and then add to it 5% of the property values at the locations not damaged. I think that's the result of their reading and I can't see how that's a plausible understanding of the name windstorm deductible. I think the result of all of this as I started at the top of applying their methodology is to have a policy that actually does not provide any meaningful protection preservation precautionary measures for named windstorms because the costs are always going to be lower what we incur are going to be lower that's the whole point of the preservation the precautionary measures but then we're going to have to take it's going to cover more locations we're going to act at more spots on our railroad than is actually going to suffer damage because we can't tell and so we're going to have more property values from which they're going to calculate our deductible and we're going to have fewer costs this case is a pretty clear example of that where we've got an $11 million deductible they've calculated on a $25 million policy subject to a $5 million in our costs and they basically admit this if you look at answering brief 28 they say that their view is not absurd because maybe we'll get precautionary coverage when there's a flood or there's a non-named windstorm I think that's just a backwards way of saying that when there's a named windstorm we're not going to get precautionary coverage and I don't think  I don't know if this is the right argument but it sounds like you're saying that if we adopt the insurance companies view then it's really never in your interest to try to prevent damage you might as well just let the damage happen and then you're in a better position to collect we're not going to do that we're going to take responsibility I understand that's why I said I don't think that's the argument to make but it sounds like that's the natural that is the incentives from the policy right the last thing I'll say your honors is that what I didn't hear from my friends this morning is any dispute on the facts or the record and so I do think as I said in my opening that the court can resolve what you think is the right reading of the named windstorm deductible here the right coverage and we I take the point on preservation we have our expense to reduce loss and our business interruption that provide full coverage for our $5.6 million claim but you can resolve those issues and then I think the actual result of this case flows from those legal determinations okay Mr. Ellis we appreciate it and we're going to be in recess until tomorrow thank you all